CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

NOV 10 2005

JOHN F. CORCORAN, CLERK
BY: ~~~~~~~~~~~
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **LARRY R. SHORT,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00132 |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:   GLEN M. WILLIAMS |
| Defendant. | ) | Senior United States District Judge |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Larry R. Short, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2005).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Short filed an application for DIB on or about December 7, 2002, alleging disability as of December 3, 2002, due to hypothyroidism, anxiety, kidney problems and convulsions. (Record, ("R."), at 52-55, 63.) His claim was denied initially and on reconsideration. (R. at 25-27, 30, 32-34.) Short then requested a hearing before an administrative law judge, ("ALJ"). (R. at 37.) The ALJ held a hearing on February 26, 2004, during which Short was represented by counsel. (R. at 205-57.)

By decision dated April 27, 2004, the ALJ denied Short's claim. (R. at 15-22.) The ALJ found that Short was insured for DIB purposes through the date of her decision. (R. at 20.) Furthermore, the ALJ found that Short had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 21.) The ALJ found that the medical evidence established that Short suffered from severe impairments, namely his degenerative joint disease, hypothyroidism, digestive disturbances and renal disease. (R. at 21.) However, the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ also found that Short's

allegations regarding his limitations were not totally credible. (R. at 21.) The ALJ further found that Short had the residual functional capacity to perform a wide range of unskilled light[1] exertional activity, subject to avoiding any left hand, overhead reaching or lifting, left hand pushing or pulling or repetitive left hand activities. (R. at 21.) The ALJ also found no medical evidence that Short required periodic naps throughout the day. (R. at 21.) The ALJ further found that Short was unable to perform any of his past relevant work. (R. at 21.) Although the ALJ found that Short's exertional limitations did not allow him to perform the full range of unskilled light work, he found a significant number of jobs existed in the national economy that Short could perform, such as work as a watchman and usher/attendant. (R. at 21.) Thus, the ALJ found that Short was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2005).

After the ALJ issued her opinion, Short pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 5-8.) Short then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed May 9, 2005, (Docket Item No. 10), and Short's Motion For Summary Judgment filed April 6, 2005. (Docket Item No. 9.)

---

[1]The regulations define light work as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

*II. Facts*

Short was born in 1950, (R. at 212), which classified him as a person closely approaching advanced age under 20 C.F.R. § 404.1563(c) at the time of the ALJ's decision. Short graduated from high school and completed formal training in welding. (R. at 213.)

At his hearing, Short testified that he had worked in welding for approximately 29 years, until he was terminated in 2001 from Payne Equipment Company, his most recent employer. (R. at 214-15.) Short looked for welding jobs after his termination but could not find any such jobs in the area. (R. at 215.) Short testified that as a welder, he would lift items weighing more than 50 pounds, crouch, squat, bend, use both hands above his head and use both arms. (R. at 240-41.) Short stated that welding required a lot of standing but not necessarily constant standing. (R. at 241-42.) Short also described experience in home improvement and had unsuccessfully tried to start his own home improvement business in 1998. (R. at 217-18.)

When asked to describe why he could no longer weld, Short complained of his nerves and inability to sleep. (R. at 217.) Short stated that he had always suffered from his nerves and had even experienced convulsions when he was younger. (R. at 217-19.) Short described symptoms that consisted of shaking and nervousness. (R. at 223.) Short attributed his nervous condition to his exposure to metals during welding. (R. at 223.) Short surmised that his current prescription for Valium was for his nerves. (R. at 219.) Short testified that he had not visited a neurologist in recent years, although he suffered from a thyroid condition, which could be controlled with

-4-

medication. (R. at 219-21.) Short cited insurance problems, a fear of scalpels and a belief of futility as the reasons why he had not visited a neurosurgeon. (R. at 225-26.) Short further testified that his family doctor, Dr. Brian S. Maggard, M.D., was going to send him to a neurosurgeon for an evaluation for surgery. (R. at 221.) Short also testified that the medication that Dr. Maggard had prescribed helped, although the nerve medication did not seem to work. (R. at 226.)

In describing his sleep difficulty, Short stated that he got only two or three hours of sleep a night, despite taking medication to help him sleep. (R. at 222.) Short elaborated that he did not sleep during the day either because of his nervous condition. (R. at 228.)

Short also complained of shoulder problems, particularly degenerative disease in his left shoulder and pain in his right shoulder. (R. at 229-30.) Short stated that he had injured his right shoulder while he was working in the 1990s but could not remember whether he received treatment for the injury. (R. at 229-30.) Short also mentioned neck pain stemming from a cervical problem. (R. at 229.) Short testified that his neck would get very stiff and he would experience sharp pains. (R. at 246.) Short testified that these problems, in his opinion, would prevent him from returning to welding because he did not believe that he could be productive. (R. at 242.) Short also stated that he did not think that he could use both hands above his head like he had done previously because raising his arms hurt his shoulders. (R. at 242-43.) Short described this pain as a "sharp physical pain that just goes through the shoulder." (R. at 243.) Short further testified that he had lower back pain that he believed would bother him if he tried to lift heavy items. (R. at 244-45.) Short stated that when he

did lift items, pain would last 30 minutes until he took pain medication. (R. at 247.) Short also stated that it was sometimes difficult to turn his head from left to right. (R. at 246.)

When asked about his daily routine, Short testified that he read, watched television, followed current sports events and collected sports cards. (R. at 230, 233.) Short testified that he did not use the internet to collect cards because sitting for more than 15 minutes in front of the computer bothered his back and nerves. (R. at 231, 243.) Short also testified that he usually paced if he was standing and would occasionally experience pain when standing (R. at 244.) Short stated that he had approximately 500,000 sports cards, many of which were worth a great deal of money. (R. at 231, 234.) Short also stated that he did some woodworking in relation to his sports card collection; he would build small plaques to display his cards. (R. at 236-37.) These plaques, which weighed under 10 pounds, Short testified, were the heaviest things that he lifted. (R. at 244-45.) Short testified that he regularly consulted others about sports card collecting and would visit the mall to browse its sports card inventory (R. at 238-39.) Short testified that he occasionally rested during the day and would sometimes have to take breaks from his daily activities due to pain. (R. at 248.)

When asked about his medications, Short testified that they caused dry mouth. (R. at 249.) Short also stated that he felt more tired when he did not take his thyroid medication. (R. at 250.) Short further testified that he did nothing for his pain besides taking his medication. (R. at 252.)

Robert Jackson, a vocational expert, also testified at Short's hearing. (R. at 252.) Jackson was asked to consider Short's past work experience. (R. at 253.) Jackson described the position of welder as "heavy and unskilled" and home improvement work as "medium and skilled." (R. at 253.) Jackson testified that none of Short's skills from welding or home improvement would be transferable to a light or sedentary[2] job. (R. at 253.) Jackson was then asked to consider Short's age and education and to assume that Short was restricted to light work, had at least a moderate amount of difficulty pushing and pulling with his left arm and could not reach overhead on any kind of regular basis. (R. at 253-54.) Jackson was further directed to assume that Short could not do repetitive work that would require use of his left hand or arm, that Short had a moderate reduction in concentration to such an extent that he would be limited to simple, noncomplex tasks and that Short could only occasionally climb, balance, kneel, crouch, crawl or stoop. (R. at 254.) Jackson testified that there were jobs in the regional or national economy that Short could perform such as night watchman. (R. at 254.) Jackson further stated that there were approximately 8,000 of these positions in the Virginia economy and over 318,000 in the national economy. (R. at 254.) Jackson also testified that Short could work as a usher/lobby attendant. (R. at 254.) Jackson stated that there were over 900 of these positions in the Virginia economy and over 33,000 in the national economy. (R. at 254.)

Jackson was asked to consider the same hypothetical but with limitations in

---

[2]The regulations define sedentary work as work that involves lifting objects weighing no more than 10 pounds at a time with occasional lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2005).

concentration, persistence and pace that were severe.  (R. at 254.) Jackson stated that these limitations would eliminate all jobs from Short's job base.  (R. at 255.)

In rendering her decision, the ALJ reviewed medical records from The Clinic; Bluefield Regional Medical Center; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Edward Hunter, M.D.; Tazewell Family Healthcare; Tazewell Community Hospital; and Robert C. Miller, Ed.D.

On November 19, 1996, The Clinic treated Short for an earache, sort throat, anxiety and stomach problems.  (R. at 181.)  Dr. Ramon A. Motos, M.D., found tenderness in Short's neck with adenitis but determined that Short's ears, chest and lungs were normal.  (R. at 181.) Dr. Motos diagnosed Short with hypothyroidism, pharyngitis or URI, anxiety, gastritis and hyperlipidemia, prescribed Synthroid, Lorabid and Nucofed Expectorant and instructed Short to continue Axid and to take an antacid as needed.  (R. at 181.)

On January 21, 1997, Short visited The Clinic for a sore throat.  (R. at 179-80.) Short claimed that he had been treated with Augmentin by Dr. March with some improvement but that he was still experiencing nose congestion, a sore throat and weakness and fatigue.  (R. at 179.)  Dr. Motos diagnosed Short with hypothyroidism, hyperlipidemia, sinusitis and pharyngitis and prescribed Lorabid.  (R. at 179.)  Dr. Motos also instructed Short to take a DuraTuss tablet daily and to continue Synthroid. (R. at 179.)  On January 23, 1997, Dr. Motos informed Short's wife that Short's cholesterol was elevated to 242 and triglyceride to 443.  (R. at 178.)  Dr. Motos

-8-

suggested that Short start an exercise program and carefully watch his diet. (R. at 178.)

On October 31, 1997, Short visited The Clinic for a follow-up examination of his hyperlipidemia and hypothyroidism. (R. at 176-77.) Short also complained of a sore throat. (R. at 176.) Dr. Motos noted that Short's pharynx was red and inflamed, but there was no adenitis. (R. at 176.) Dr. Motos diagnosed Short with hypothyroidism, hyperlipidemia and pharyngitis and gave Short Lorabid and a refill on Synthroid. (R. at 176.)

Short did not visit The Clinic again until March 16, 2000. (R. at 174-75.) At this appointment, Short denied any chest pain or shortness of breath and reported that he had been working without any problems. (R. at 174.) Dr. Motos found that Short's thyroid was not enlarged, and his chest and lungs were clear. (R. at 174.) Dr. Motos diagnosed Short with hyperlipidemia, hypothyroidism and malaise and fatigue and prescribed Xanax and Synthyroid. (R. at 174.)

On March 19, 2002, Short returned to The Clinic for a follow-up for his hyperlipidemia and hypothyroidism. (R. at 117-18.) Short's cholesterol was 244 and his triglycerides were 756. (R. at 117.) Dr. Motos diagnosed Short with hypothyroidism, hyperlipidemia and anxiety, continued Short's use of Xanax, reduced Short's dosage of Synthroid and started Short on Lopid. (R. at 117.)

On March 17, 2003, Short visited The Clinic with complaints of weakness, anxiety, nervousness, difficulty sleeping, depression and acid reflux. (R. at 115-16.) A lipid panel showed Short's cholesterol was 234 and his triglycerides were 272 with

HDL at 49 and LDL at 110. (R. at 116.) Dr. Motos diagnosed Short with hypothyroidism, anxiety and gastritis with acid reflux, gave Short samples of Nexium and Ambien and continued Short's use of Synthroid, Lopid and Xanax. (R. at 115-16.)

On March 27, 2003, Bluefield Regional Medical Center, ("BRMC"), treated Short for a sharp pain and discomfort in his neck and shoulder. (R. at 122-25.) Images were taken of Short's left shoulder, which showed no acute fracture or subluxation. (R. at 122.) There also was no evidence of calcific tendonitis; however, there was a mild degenerative change of the left acromioclavicular joint. (R. at 122.) Images of Short's cervical spine were somewhat limited but showed no acute fracture. (R. at 123.) These images showed no prevertebral soft tissue swelling, while Short's intervertebral disc spaces appeared to be of normal height. (R. at 123.) Furthermore, the images showed that Short's bony structure appeared normally ossified with very mild posterior osteophyte formation at the C5-C6 level. (R. at 123.)

On March 28, 2003, Dr. Edward Hunter, M.D., performed a medical consultant examination on Short at the request of the Virginia Department of Rehabilitative Services. (R. at 149-53.) Short presented Dr. Hunter with a long list of complaints including thyroid disease, nerves, depression, sleep difficulty, fatigue, anxiety, joint pain, hyperlipidemia, heartburn, remote history of seizures as a child and shoulder pain, which Short described as his primary complaint. (R. at 149.) Upon a physical examination, Dr. Hunter noted that there was no clubbing, cyanosis or edema, and distal pulses were 2+ and equal bilaterally. (R. at 151.) However, Short's left upper extremity showed some diminished range of motion per chart secondary to discomfort. (R. at 149.) Short's range of motion in his back was within normal limits. (R. at 151.)

-10-

Dr. Hunter diagnosed Short with chronic left shoulder pain without evidence of muscle impairment, hyperlipidemia, insomnia, hypothyroidism, GERD, anxiety, depression, chronic fatigue, remote seizure as an adolescent, status post tonsillectomy, remote history of kidney problems and probable arthritis. (R. at 152.) Dr. Hunter reported that Short might have some difficulties with lifting, carrying or handling heavier objects and utilizing his left upper extremity, especially in a way that involved maneuvers over his head. (R. at 152.) Dr. Hunter noted, however, that Short had not had a MRI of his shoulder, which could reveal a problem such as a rotator cuff injury that could be corrected with surgery. (R. at 152.) Dr. Hunter found no problems with Short's ability to creep, crawl, crouch, climb, stoop, bend, travel, speak, hear, understand, sustain concentration and persistence, socially interact and adapt. (R. at 152-53.) At the time this report, x-rays of Short's cervical spine and left shoulder were pending. (R. at 153.)

On April 1, 2003, R.J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Short. (R. at 126-40.) In the PRTF, Milan concluded that Short had an anxiety-related disorder that was not severe but that Short also had a coexisting nonmental impairment that required referral to another medical specialist. (R. at 126.) Dr. Milan found that Short was mildly limited in activities of daily living and in maintaining concentration, persistence or pace but was not limited in maintaining social functioning or by repeated episodes of decompensation. (R. at 136.) The PRTF findings were affirmed on June 24, 2003, by Joseph Leizer, Ph.D., another state agency psychologist. (R. at 126.)

On April 21, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment on Short. (R. at 141-49.)

-11-

Dr. Johnson concluded that Short could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (R. at 142.) Dr. Johnson found that Short's ability to push and/or pull was limited in his upper extremities, namely his shoulders. (R. at 142.) Dr. Johnson relied on Dr. Hunter's consultative exam, Short's list of current medications and Short's allegations in making his assessment and found Short's allegations to be partially credible. (R. at 143.) Dr. Johnson further found that Short had no postural limitations or manipulative limitations except for a limitation on his left side in reaching in all directions, including overhead. (R. at 144.) Dr. Johnson assessed that Short had no visual limitations, communicative limitations or environmental limitations. (R. at 145-46.) Johnson's findings were affirmed on June 25, 2003, by Dr. Michael J. Hartman, M.D., another state agency physician. (R. at 148.)

On October 6, 2003, Short returned to The Clinic complaining of sleep difficulty, nervousness and anxiety. (R. at 172-73.) At this visit, Short's blood pressure was elevated at 180/100. (R. at 172.) Dr. Motos assessed Short with hypothyroidism, possible hypertension, hyperlipidemia and anxiety. (R. at 172.) Dr. Motos started Short on Klonopin, Lopid and Celebrex. (R. at 172.)

On December 10, 2003, Short visited Tazewell Family Healthcare for neck and bilateral shoulder pain. (R. at 155-56.) Short also reported that he was experiencing left elbow pain, hypothyroidism, weakness, sleep difficulty and shortness of breath. (R. at 155.) Dr. Brian S. Maggard, M.D., found some spinous process tenderness over

the C5-C6 level and positive paracervical muscular tenderness. (R. at 155.) There also was positive muscle spasm into both trapezius muscles. (R. at 155.) Dr. Maggard noted that Short's extremities revealed 2+ distal pulses but no clubbing, cyanosis or edema. (R. at 155.) Dr. Maggard found some diffuse tenderness throughout Short's right lower extremity and some crepitus with range of motion as well as some degenerative changes in Short's left elbow. (R. at 155.) Short was assessed with degenerative joint disease, degenerative disc disease, diffuse muscle tenderness (although suspect), shortness of breath, hypothyroidism, chronic anxiety and insomnia. (R. at 156.) Dr. Maggard continued Short's use of Synthroid, alprazolam and Klonopin and scheduled a MRI. (R. at 156.)

On December 15, 2003, Short underwent a MRI on his cervical spine at Tazewell Community Hospital, which revealed multiple posterior protrusions in the discs between C4-C7, with the worst present at C6-C7, where the latter was associated with indentation of the thecal sac. (R. at 157-58.) There also was minimal compression of the left side of the cord, which probably compromised the C5 nerve root. (R. at 157.) MRIs of Short's lumbosacral spine, cervical region and right elbow showed mild degenerative change in the C5-C6 and L5-S1 discs with a tiny spur arising from the posterior aspect of the olecranon process of the right ulna. (R. at 158.)

On January 21, 2004, Miller performed a psychological evaluation on Short. (R. at 162-71.) Miller found Short fully-oriented with no signs of mania or suicidal intent, although Short admitted that he did occasionally have thoughts of suicide. (R. at 164.) Miller further found that Short's thought content was preoccupied with his health problems and worries about his family. (R. at 164.) Miller noted that Short's anxiety

did appear to markedly affect his social functioning, and Short could display significant phobic symptoms and behaviors in response to his anxiety that would interfere in some significant way with his life. (R. at 166.) Miller diagnosed Short with a panic disorder without agoraphobia, a major depressive disorder that was moderate and a pain disorder associated with both psychological factors and a general medical condition. (R. at 167.) Miller also found that Short had a current Global Assessment of Functioning, ("GAF"), of 45.[3] (R. at 167.)

On January 21, 2004, Robert C. Miller, Ed.D., performed a Medical Assessment Of Ability To Do Work Related Activities (Mental) on Short. (R. at 168-69.) Miller concluded that Short would have a fair ability to follow work rules, to use judgment with the public, to function independently and to maintain attention and concentration, while he would have a poor or no ability to relate to co-workers, to deal with the public, to interact with supervisors and to deal with work stresses. (R. at 168.) In making performance adjustments, Miller found that Short would have a good ability to follow simple job instructions but a poor or no ability to follow complex job instructions and detailed job instructions. (R. at 169.) Furthermore, Miller concluded that Short would have a good ability to maintain personal appearance, a fair ability to behave in an emotionally stable manner and a poor or no ability to relate predictably in social situations or to demonstrate reliability. (R. at 169.) Miller also administered a Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), and found Short to

_____

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates"[s]erious symptoms...OR any serious impairment in social, occupational, or school functioning..." DSM-IV at 34.

have a verbal IQ score of 84, a performance IQ score of 75 and a full-scale IQ score of 78. (R. at 170.)

On March 15, 2004, Dr. Maggard completed a Medical Assessment Of Ability To Do Work Related Activities (Physical) for Short. (R. at 182-83.) Dr. Maggard concluded that Short's ability to lift/carry was affected by his impairment, with items weighing five pounds being the maximum Short could carry occasionally and items weighing two pounds being the maximum Short could carry frequently. (R. at 182.) Dr. Maggard also found that Short's degenerative disc disease affected his standing, walking and sitting, for Short could stand for only an hour and could not stand without interruption for more than 10 minutes. (R. at 182.) Dr. Maggard determined that Short could sit for less than one hour and could not sit without interruption for more than 15 minutes because of his degenerative disc disease. (R. at 182.) Dr. Maggard concluded that Short could never climb, stoop, kneel, balance, crouch or crawl because of his degenerative disc disease. (R. at 173.) Dr. Maggard further found that seeing, hearing and speaking were not affected by Short's impairment but that reaching, handling, feeling and pushing/pulling were affected by his degenerative disc disease. (R. at 183.) Dr. Maggard also concluded that Short had environmental restrictions with regard to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration because of his degenerative disc disease and restrictive lung disease. (R. at 183.)

On May 3, 2004, Short returned to Tazewell Family Healthcare with continued anxiety and occasional panic attacks. (R. at 189.) Short also complained of insomnia and depression. (R. at 189.) Dr. Maggard diagnosed Short with cervical degenerative

disc disease with C5 neuritis, anxiety and depression. (R. at 189.) Dr. Maggard refilled a prescription of Darvocet, stopped Valium and placed Short on Klonopin and Remeron. (R. at 189.) In a letter for Short's file, Dr. Maggard stated that Short's prognosis for recovery for his anxiety, depression, insomnia and severe degenerative disc disease was very poor. (R. at 190.)

On July 28, 2004, Dr. Maggard completed a Medical Assessment Of Ability To Do Work Related Activities (Mental) and a Medical Assessment Of Ability To Do Work Related Activities (Physical) for Short. (R. at 195-98.) Dr. Maggard concluded that Short would have a good ability to function independently and a fair ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors and to maintain attention and concentration, while he would have a poor or no ability to deal with work stresses. (R. at 195.) In making performance adjustments, Dr. Maggard found that Short would have a fair ability to follow simple job instructions, to follow complex job instructions and to follow detailed job instructions. (R. at 196.) Furthermore, Dr. Maggard concluded that Short would have a fair ability to maintain personal appearance and to behave in an emotionally stable manner but a poor or no ability to demonstrate reliability. (R. at 196.) Dr. Maggard's determinations were based on Short's severe anxiety and bipolar disorder. (R. at 195-96.)  Regarding Short's physical limitations, Dr. Maggard's conclusions were unchanged from his March 15, 2004, assessment. (R. at 197-98.)

On August 31, 2004, Dr. Maggard once again completed a Medical Assessment Of Ability To Do Work Related Activities (Mental) and a Medical Assessment Of Ability To Do Work Related Activities (Physical) for Short. (R. at 199-204.) His

-16-

findings were unchanged from his earlier assessments. (R. at 199-204.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2004); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 27, 2004, the ALJ denied Short's claim. (R. at 15-22.) The ALJ found that Short was insured for DIB purposes through the date of her

decision.  (R. at 20.)  Furthermore, the ALJ found that Short had not engaged in substantial gainful activity since the alleged onset of disability.  (R. at 21.)  The ALJ found that the medical evidence established that Short suffered from severe impairments, namely his degenerative joint disease, hypothyroidism, digestive disturbances and renal disease.    (R. at 21.)    However, the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.    (R. at 21.)  The ALJ also found that Short's allegations regarding his limitations were not totally credible.  (R. at 21.)  The ALJ further found that Short had the residual functional capacity to perform a wide range of unskilled light exertional activity, subject to avoiding any left hand, overhead reaching or lifting, left hand pushing or pulling or repetitive left hand activities.  (R. at 21.)  The ALJ also found no medical evidence that Short required periodic naps throughout the day.  (R. at 21.)  The ALJ further found that Short was unable to perform any of his past relevant work. (R. at 21.) Although the ALJ found that Short's exertional limitations did not allow him to perform the full range of unskilled light work, he found a significant number of jobs existed in the national economy that Short could perform, such as work as a watchman and usher/attendant.  (R. at 21.)  Thus, the ALJ found that Short was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520 (g) (2005).

Short argues the ALJ's decision was not based on the substantial evidence of the record. (Motion For Summary Judgment And Memorandum Of Law On Behalf Of The Plaintiff, ("Plaintiff's Brief"),  at 8.)  Specifically, Short argues that the ALJ erred in finding that Short's anxiety, depression, insomnia and degenerative disc disease were

not severe. (Plaintiff's Brief at 8.) Short further argues that the ALJ erred by failing to consider the combined effect of Short's impairments on his ability to work. (Plaintiff's Brief at 10.) Short also argues that the ALJ erred in failing to give proper weight to the opinion of Short's treating physician, Dr. Maggard. (Plaintiff's Brief at 11.) Finally, Short argues that the ALJ erred in failing to give proper weight to the opinion of Robert Miller, the only psychological examiner of record. (Plaintiff's Brief at 12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). The court will further consider any evidence that the Appeals Council considered in reaching its decision not to grant review of the case. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).[4]

_____

[4]In this case, such evidence consists of pharmacy printouts from the Medicine Shoppe, dated March 20, 2002, through May 4, 2004, medical notes from Dr. Maggard dated February 17, 2004, through June 14, 2004, a letter from Short, undated, medical assessments from Dr. Maggard dated July 28, 2004, and medical assessments from Dr. Maggard, dated August 31, 2004.

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains his rationale and if the record supports her findings.

Short first argues that the ALJ erred in failing to find that his anxiety, depression, insomnia and degenerative disc disease were not severe. (Plaintiff's Brief at 8-10.) Unless an impairment is expected to result in death, it must have lasted or been expected to last for a continuous period of at least 12 months in order to render an individual disabled. *See* 20 C.F.R. § 416.909(b) (2005). Furthermore, the Social Security regulations define a "severe" impairment as an impairment that significantly limits a claimant's ability to do basic work activities. *See* C.F.R. § 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 416.921(b) (2005). The Fourth Circuit has held that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler* 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v.*

*Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

The court finds that substantial evidence supports the ALJ's finding that Short's anxiety, depression, insomnia and degenerative disc disease were not severe. In making her determination with regard to Short's anxiety and depression, the ALJ relied on the reports from state agency psychologists dated April 1, 2003, and June 24, 2003, stating that Short had no severe mental health problem. (R. at 17.) The ALJ also rejected Robert Miller's opinion concerning Short's mental health as inconsistent with Short's daily activities and the rest of the record. (R. at 18.) Substantial evidence also exists to support the ALJ's finding that Short's degenerative disc disease was not severe. Dr. Maggard is the only physician of record who had diagnosed Short with the disease and placed limitations on Short as a result of the disease. However, the ALJ assigned little weight to Dr. Maggard's opinions because they were inconsistent with Short's daily activities and the rest of the record, including Dr. Hunter's opinion and Short's MRI results. (R. at 18.) I also find substantial evidence exists to support the ALJ's finding that Short's insomnia was nonsevere. There is nothing in the record to suggest that Short's insomnia was a severe impairment. While the record is replete with allegations of insomnia and even diagnoses of insomnia, there is nothing to indicate that it would have significantly limited Short's ability to do basic work activities. Therefore, the ALJ did not err in finding that Short's anxiety, depression, insomnia and degenerative disc disease were not severe.

Short also argues that the ALJ erred by failing to consider the combined effect of Short's impairments on his ability to work. (Plaintiff's Brief at 10-11.) An ALJ

must consider the combined effect of a claimant's impairment to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curium) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, "the ALJ must adequately explain his or her evaluation of the combined effect of impairments." *Reichenbach*, 808 F.2d at 312.

The court finds that the ALJ adequately considered the combined effect of all of Short's impairments on his ability to work. Short's argument hinges on the allegation that the ALJ did not accord due weight to his anxiety, depression, insomnia and degenerative disc disease. (Plaintiff's Brief 10.) However, as the court previously found, there is substantial evidence to support the ALJ's conclusion that Short's anxiety, depression, insomnia and degenerative disc disease were nonsevere. In making that determination, the ALJ discredited the opinions of Dr. Maggard and Robert Miller. (R. at 18.) The ALJ then evaluated Short's degenerative joint disease, hypothyroidism, digestive disturbances and renal disease, which he did find to be severe. (R. at 18-19.) Since the ALJ adequately addressed each of Short's ailments, she properly considered the combined effect of his impairments on his ability to work.

Short further argues that the ALJ erred by discrediting the opinion of Dr. Maggard, Short's treating physician. (Plaintiff's Brief at 11-12.) The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ

-22-

must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2005). However "circuit precedent does not require that a treating physician's testimony be given controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. When the ALJ does not give the treating source's opinion controlling weight, the ALJ applies the following factors to determine what weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(d)(2).

In rejecting Dr. Maggard's Medical Assessment Of Ability To Do Work Related Activities (Physical) dated March 15, 2004, the ALJ found Dr. Maggard's finding that Short was restricted to sedentary activity to be inconsistent with the stage agency's finding, which had restricted Short to light activity. (R. at 18.) Furthermore, the ALJ noted that Short's testimony concerning his frequent activities of woodworking, card organizing and occasional shopping was inconsistent with Dr. Maggard's limitations. (R. at 18.) The ALJ also found relevant that Dr. Maggard did not begin treating Short until Short had been laid off and his unemployment benefits had expired. (R. at 18.) The ALJ determined that Dr. Maggard's opinion found no support in Short's MRI results. (R. at 18.) The ALJ indicated that Dr. Hunter, Short's former treating physician, had performed a consultative exam on March 28, 2003, and merely limited

Short to no overhead lifting. (R. at 18.) As a result of the fact that the ALJ applied the factors set forth in 20 C.F.R. § 404.1527(d)(2) and Dr. Maggard's opinions were inconsistent with other substantial evidence, the court finds that substantial evidence supports the ALJ's decision to discredit Dr. Maggard's opinion.

In Short's final argument, he argues that the ALJ erred in failing to give proper weight to the opinion of Robert Miller, the only psychological examiner of record. (R. at 12-13.) As stated above, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*,, 715 F.2d at 869. But if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In choosing to give Miller's opinion "very little weight," the ALJ found Miller's opinions inconsistent with Short's daily activities and the weight of the medical evidence. (R. at 18.) In particular, the ALJ noted that Miller gave Short a GAF score of 45 and a diagnoses of a panic disorder, a major depressive disorder and a (somatoform) pain disorder, which would render Short a mental health invalid. (R. at 18.) Miller also determined that Short had a poor or no ability to deal with the public or co-workers, to deal with work stresses, to relate predictably in social situations or to demonstrate reliability. (R. at 18.) The ALJ found Miller's opinions unsupported by the record, as evidenced by the fact that Short enjoyed woodworking, collecting baseball cards and going out in public areas to deal in card collecting. (R. at 18.)

-24-

Furthermore, the ALJ found nothing in the record to indicate that Short was close to institutionalization for mental health treatment (as suggested by the GAF score of 45), especially in light of the fact that Short had received no mental health professional care and only took medication for his nerves prescribed by his family doctor.  (R. at 18.) Since the ALJ applied the factors set forth in 20 C.F.R. § 404.1527(d)(2), and Miller's opinions were inconsistent with other substantial evidence, the court finds that substantial evidence supports the ALJ's decision to assign little weight to Miller's opinion.

### IV. Conclusion

For the foregoing reasons, I will overrule Short's motion for summary judgment, sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:      This 10ᵗʰ day of November 2005.

SENIOR UNITED STATES DISTRICT JUDGE